<u>NOT FOR PUBLICATION</u>                                    [24, 26, 34]


# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

_____
                                  :
RAMON HERNANDEZ,                  :        Civil Action No. 05-3038 (FLW)
                                  :
            Plaintiff,            :
      v.                          :            **OPINION**
                                  :
PAUL CULLISON, et al.,            :
                                  :
            Defendants.           :
_____ :

<u>**WOLFSON, UNITED STATES DISTRICT JUDGE**</u>

Before the Court is a motion by Defendants Lt. Paul Cullison, Sgt. James Dice, Sgt. Lee Middleton, Sgt. Joseph Saverine, Sgt. Jennifer Watson, SCO Nicholas Ives, SCO Dawne Johnson, SCO Edward Lematty, SCO Kenneth Muller, SCO Gregory Palau, SCO Casey Piatt, and SCO Marvin Young ("the State Defendants"), seeking summary judgment, pursuant to <u>Fed. R. Civ. P.</u> 56, on the Complaint of Plaintiff Ramon Hernandez, a prisoner currently confined at East Jersey State Prison in Rahway, New Jersey.  Also before the Court is a motion, pursuant to <u>Fed. R. Civ. P.</u> 12(b)(6), to dismiss Plaintiff's medical negligence claim or, alternatively, for summary judgment on that claim, filed by Defendant Corrections Medical Services ("CMS") and Defendant Nancy Gottwald, a registered nurse, as well as their separate motion for summary judgement on Plaintiff's Eighth Amendment claim against them.

Plaintiff alleges, pursuant to 42 U.S.C. § 1983, that the State Defendants violated his Eighth Amendment guarantee to be free from cruel and unusual punishment by: (1) failing to protect him from an inmate they knew intended to harm him; (2) using excessive force against

him while breaking up a fight in which he was involved; and (3) failing to adequately train prison staff.  Plaintiff further argues that Defendants CMS and Gottwald similarly violated his Eighth Amendment rights by failing to provide him with medical treatment for a shoulder injury he suffered.  Plaintiff also asserts a state common law medical negligence claim against CMS and Gottwald.

In their motion for summary judgment, the State Defendants argue: (1) Plaintiff's claims are barred by his failure to exhaust his administrative remedies under 42 U.S.C. §1997e(a), the Prison Litigation Reform Act of 1996 ("PLRA"), and (2) they are entitled to qualified immunity.  Defendants CMS and Gottwald urge the Court to grant summary judgment on Plaintiff's § 1983 claim against them because: (1) it is also barred by the PLRA; (2) Plaintiff cannot establish the existence of an unconstitutional policy to which they adhered; and (3) there is no material factual dispute that they provided Plaintiff with sufficient medical care.  Additionally, in their motion to dismiss Plaintiff's medical negligence claim, CMS and Gottwald argue that Plaintiff's claim must be dismissed because: (1) he failed to file an affidavit of merit, pursuant to N.J. Stat. Ann. § 2A:53A-27, and (2) the common knowledge doctrine does not relieve Plaintiff of his obligation to comply with the Affidavit of Merit Statute because the applicable standard of care in this case is not within the ken of a layperson.

The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.  For the reasons that follow, the State Defendants' motion for summary judgment is granted, and Plaintiff's claims against them are dismissed.  Furthermore, the motion for summary judgment on Plaintiff's constitutional claim filed by CMS and Gottwald is also granted.  However, their motion to dismiss Plaintiff's negligence claims is granted only as to Gottwald, but denied as to

2

CMS.  Finally, Plaintiff's request for appointment of pro bono counsel is granted.

## I.    BACKGROUND

On or about May 7, 2004, Ramon Hernandez was an inmate in the custody of the New Jersey Department of Corrections housed at South West State Prison ("SWSP"), in Bridgeton, New Jersey. See Affidavit of Steven M. Johnson ("Johnson Aff."), Ex. A.  That day, Plaintiff alleges he learned that his cell mate, Abdul Ghaffar ("Ghaffar"), had attempted to sell Plaintiff's stereo to another inmate while Plaintiff was at work.  Plaintiff's Complaint ("Compl.") at ¶ 19.  On May 8, 2004, Plaintiff alleges he spoke to a corrections officer at SWSP about Ghaffar's alleged attempted sale of Plaintiff's personal property and requested that either he or Ghaffar be transferred to a different cell. Id. at ¶ 20.  On May 9, 2004, Plaintiff alleges he spoke with Defendant Ives, and reiterated his request. Id. at ¶ 21.  Plaintiff alleges that Defendant Ives accompanied Plaintiff and Ghaffar to speak with Defendant Watson, who questioned the men about Plaintiff's allegations. Id. at ¶ 22.  According to Plaintiff, Defendant Watson asked Plaintiff if he was afraid of Ghaffar, to which Plaintiff responded he was not, and explained that he had requested the transfer to avoid the possibility of a confrontation between himself and Ghaffar. Id. at ¶ 23.  Defendant Watson also asked Plaintiff if he wished to remain in his cell, to which Plaintiff responded that it made no difference to him. Id. at ¶ 24.

On May 10, 2004, Plaintiff allegedly presented his request to be transferred to SWSP Corrections Officer Fogg, who, according to Plaintiff, agreed to move Plaintiff to a new cell. Id. at ¶ 25.  However, after Fogg learned that Defendant Watson had already discussed the matter with Plaintiff, Fogg informed Plaintiff that he could not override Defendant Watson's decision not to move Plaintiff. Id. at ¶ 26.  Plaintiff alleges that he then insisted on speaking to a Captain.

Id.  Fogg left Plaintiff's unit and returned a short time later with another SWSP staff person, whom Plaintiff described as the "first shift supervisor," and whom Plaintiff alleges asked Ghaffar if Ghaffar wished to be moved to a different unit. Id. at ¶ 27.  According to Plaintiff, Ghaffar declined to be moved, and Fogg informed Plaintiff that Fogg would speak to Defendant Watson about moving Plaintiff the next morning. Id.

Later that day, a fight ensued between Plaintiff and Ghaffar.[1] Id. at ¶ 28.  Plaintiff alleges that approximately twenty corrections officers responded to the "wing officer['s]" call for help to break up the fight. Compl. at ¶ 28.  He further alleges that once the officers arrived, they did not break up the fight, but rather, allowed the inmates to continue fighting for approximately two minutes before intervening. Id. at ¶¶ 30-32.  Plaintiff asserts that the officers cheered the inmates on and chanted "fight! fight!" Id. at ¶ 31.  During the fight, Plaintiff alleges that he assumed a defensive posture, and attempted to block Ghaffar's punches. Id.  According to Plaintiff, the corrections officers eventually broke up the fight by tackling both inmates, wrestling them to the floor, and placing them in handcuffs. Id. at ¶ 32.  Plaintiff alleges that several officers placed "their knees on the back of [his] head and the left upper side of [his] shoulder[]," and that after he was handcuffed, an officer pinned Plaintiff to the floor, placing all of his weight on Plaintiff for "several minutes." Id. at ¶ 32.  Plaintiff asserts that he attempted to inform the officers that his health was poor and that he "had shoulder problems," but the officers "ignored [his] pleas" and lifted him "forcefully" to his feet by the handcuffs around his wrists. Id. at ¶ 33.

---

[1] Plaintiff alleges that Ghaffar instigated the fight by calling Plaintiff names, threatening Plaintiff, and, throwing bodily fluids at Plaintiff. Id.  However, shortly after the fight, on May 14, 2004, Plaintiff pled guilty to an SWSP disciplinary charge alleging Plaintiff threw feces at Ghaffar prior to their fight on May 10, 2004. See Affidavit of Carlos Villar ("Villar Aff."), Ex. B.

Once the officers had restrained the two inmates, they escorted Plaintiff to a holding cell where Defendant Watson questioned him about how he felt and Defendant Gottwald examined him. Id. at ¶ 34.  Defendant Gottwald gave Plaintiff a bag of ice to place on his shoulder and medication for pain. Id. at ¶ 36; see also Certification of David J. Bishop ("Bishop Cert.") attached to Brief in Support of Summary Judgment by Defendants CMS and Gottwald, Ex. B at Gottwald Holding Cell Exam Note.  She noted that Plaintiff had "[n]o visible or palpable injuries," and cleared him to be housed in detention. Id.  Defendant Gottwald also ordered an orthopedic consult for Plaintiff. Id.

Plaintiff was then transported to an SWSP detention unit where he was searched by three officers. Compl. at ¶ 35.  Plaintiff alleges that he had difficulty raising his left arm during the search.  Id. at ¶¶ 35-36.  At that time, another SWSP nurse, Tiffany Pipitone, examined Plaintiff and noted shoulder deformity and limited range of motion in his left arm, but that Plaintiff had normal sensation in the fingers of his left hand. See Bishop Cert., Ex. B at Pipitone Chart Note.  Pipitone also called Dr. Stephen Hoey, D.O., to discuss Plaintiff's health complaints, and, in accord with Dr. Hoey's prescription, administered 800 milligrams of Motrin, five times daily, for Plaintiff's pain, applied a sling to Plaintiff's left arm, and provided Plaintiff with ice for his shoulder. Id.  Pipitone also noted her intention to contact another health care worker about taking Plaintiff to an orthopedic clinic in Cumberland County. Id.  On May 11, 2004, Pipitone performed a follow-up evaluation of Plaintiff's shoulder and noted "positive radial and brachial pulses to [his] left arm ... positive sensation and movement of all fingers to left hand with brisk capillary refill...." Id.  Pipitone also noted that Plaintiff's sling remained intact and provided him with a fresh ice pack. Id.  Later that day, Dr. Maurice Roseman, D.O., scheduled an orthopedic

consult for Plaintiff in Vineland, and made transportation arrangements. Id. at Roseman Chart Note.

Defendant Gottwald examined Plaintiff after his visit to the orthopedic clinic on May 11, 2004. Id. at Gottwald Chart Note (DOC SPECIAL).  She noted that Plaintiff denied any medical emergency, and that Dr. Hoey cleared Plaintiff to return to detention. Id.  Nurse Laura Mish also examined Plaintiff after his return from the orthopedic clinic, and observed "[n]o acute distress." Id. at Mish Chart Note.  The same day, Dr. Hoey reviewed the notes from Plaintiff's consultation with Dr. Gerald Packman, M.D. Id. at Hoey Consultation Report.  Dr. Hoey noted that Dr. Packman found a tear of Plaintiff's pectoralis muscle and contusions on Plaintiff's left ribs. Id. Dr. Hoey also noted that Dr. Packman recommended an urgent MRI of Plaintiff's left shoulder to evaluate Plaintiff's pectoralis muscle, which, if torn, Dr. Packman opined, would require surgical repair in no less than two or three weeks. Id.  Also on May 11, 2004, Dr. Hoey entered a requests for an MRI of Plaintiff's shoulder. Id.  On the following day, Plaintiff completed an MRI screening checklist for the left shoulder. Id. at Screening Checklist.

On May 25, 2004, Plaintiff was transferred from SWSP to an administrative segregation unit at East Jersey State Prison ("EJSP"). See Johnson Aff., Ex. A: Inmate Progress Note (final page); see also Bishop Cert., Ex. B at Transfer Out Form.[2]  On May 28, 2004, an EJSP nurse, Kevin Kelly, noted that Plaintiff continued to complain of shoulder pain and that Plaintiff's MRI was not completed because of his transfer from SWSP to EJSP. Bishop Cert., Ex. B at Kelly Risk

_____

[2] Plaintiff alleges he was transferred to EJSP on May 15, 2004. Compl. at ¶ 39.  However, he cites no documentary evidence to support that assertion, and he does not address the discrepancy between his recollection and the SWSP Inmate Progress Note, which lists his transfer date as May 25, 2004.  The clear evidence presented by the State Defendants, CMS, and Gottwald establishes Plaintiff's transfer date as May 25, 2004, and I conclude that there is no material factual dispute as to that date.

Assessment Form.  Kelly also noted that Plaintiff's MRI would be rescheduled and that Plaintiff continued to receive Motrin for pain. Id.  On June 10, 2004, Plaintiff underwent an MRI of his left shoulder which revealed a "[m]assive full thickness rotator cuff tear with medial tendon retraction, muscular atrophy, and bicipital tendon subluxation, [with] moderate joint effusion. Id. at Findings of Mark J. Tenenzapf, M.D.  The medical report also noted deformity of the anterior and posterior labrum, which the author opined was "most likely degenerative in nature." Id.  On June 24, 2004, Plaintiff underwent an orthopedic consult with Dr. Lawrence Donokor, M.D., at the at the St. Francis Medical Center. Id. at Referral Form.  Dr. Donokor's report indicates that he confirmed the earlier diagnosis of Plaintiff's shoulder and recommended surgery. Id.

On July 2, 2004, Plaintiff signed a consent form for surgery on his left shoulder. Id. at Consent For Medical, Dental or Surgical Treatment.  On September 13, 2004, an EJSP nurse, Sonia Goroza, noted in Plaintiff's medical chart that she received an inquiry regarding Plaintiff's pending surgery and discovered the surgery had not yet been scheduled. Id. at Goroza Chart Note.  Goroza called the EJSP consult coordinator, who confirmed that Plaintiff's surgery had not been scheduled and that the scheduler was awaiting the orthopedic surgeon's reply. Id.  On October 12, 2004, Dr. Elmira Kapchits, M.D., noted in Plaintiff's medical chart that Plaintiff's orthopedic surgery had been scheduled for November 17, 2004. Id. Kapchits Chart Note.  Kapchits also indicated that she would order Plaintiff's anti-inflammatory medication terminated seven days prior to his surgery, and schedule him for post-operative physical therapy. Id.  On November 9, 2004, Plaintiff filed an Administrative Remedy Form at EJSP in which he requested medical treatment for the shoulder injury he alleged he suffered at SWSP. See Administrative Remedy Form, attached to Plaintiff's Brief in Opposition to the State Defendants' Motion for Summary

7

Judgment.  On November 11, 2004, in the Administrative Remedy Response section of

Plaintiff's Administrative Remedy Form, an EJSP official noted that Plaintiff's surgery was

already scheduled and pending. Id.

On November 17, 2004, Plaintiff underwent surgery on his left shoulder. Compl. at ¶ 40;

see also Bishop Cert. Ex. B at Operative Report.  Between November 17, 2004, and November

26, 2004, Plaintiff remained in the EJSP infirmary. Id. at Chart Notes for 11/17/2004 through

11/26/2004.  Plaintiff did not report any complications following surgery, nor did he allege in his

Complaint that he did not receive adequate and prompt care during his recovery and

rehabilitation.

In a November 30, 2004 letter to SWSP Administrator, Kathryn MacFarland

("MacFarland"), Plaintiff requested "permission and instruction on how to exhaust the SWSP

administrative remedy process notwithstanding the period of time [that has] elapsed" since May

10, 2004, nor his transfer from SWSP to EJSP. See Plaintiff's November 30, 2004 Letter to

Kathryn MacFarland ("Letter to MacFarland"), attached to Plaintiff's Brief in Opposition to the

State Defendants' Motion for Summary Judgment.  In the letter, Plaintiff admitted he did not file

an Administrative Remedy Form while at SWSP, but explained that he failed to do so because

the social worker assigned to the detention unit in which Plaintiff was housed after his fight with

Ghaffar "failed to provide" Plaintiff with an Administrative Remedy Form. Id.  On January 20,

2005, MacFarland responded to Plaintiff's letter. See Letter to Ramon Hernandez #292273 from

Kathryn MacFarland ("MacFarland reply letter"), attached to Plaintiff's Brief in Opposition to

the State Defendants' Motion for Summary Judgment.  In her letter, MacFarland explained that

she was "referring [Plaintiff's letter] regarding [the] incident that [Plaintiff] allege[ed] happened

8

on [May 10, 2004] to the Special Investigations Division for whatever actions they deem appropriate." Id.  The record does not include any evidence of what action, if any, the Special Investigations Division recommended.

On June 13, 2005, Plaintiff filed a pro se Complaint together with an application to proceed in forma pauperis ("IFP"), without prepayment of fees, pursuant to 28 U.S.C. § 1915. On June 21, 2005, the Court granted Plaintiff's IFP application and ordered the Clerk of the Court to file his Complaint without prepayment of fees or security.  July 27, 2005, the Court granted the State Defendants' application for an extension of time to answer, move or otherwise reply, pursuant to L. Civ. R. 6.1.  On August 12, 2005, the State Defendants filed a motion to extend time to answer, move or otherwise reply, pursuant to Fed. R. Civ. P. 6(b)(1), which the Court granted on September 12, 2005.  On October 12, 2005, in lieu of an answer, the State Defendants filed a motion for summary judgment on Plaintiff's Complaint.  On December 8, 2005, Defendants CMS and Gottwald filed a motion to dismiss Plaintiff's medical negligence claim. Plaintiff filed separate opposition to the State Defendants' motion for summary judgment and the motion to dismiss by Defendants CMS and Gottwald.  On March 10, 2006, Defendants CMS and Gottwald filed a motion seeking summary judgment on Plaintiff's constitutional claim.  Plaintiff did not file opposition to that motion.

## II.    DISCUSSION

## A.    Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A dispute is

"genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id. The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. Celotex, 477 U.S. at 330.  Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  To do so, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

**B.**     **Unauthorized Practice of Law**

     Before proceeding, the Court must first address an issue not raised by the State Defendants, but which significantly impacts the Court's consideration of their motion.  The Court must address whether "A. Khaliq," whose signature appears on Plaintiff's brief in opposition to the State Defendants' motion for summary judgment, has engaged in the unauthorized practice of law by preparing and signing a document filed under Plaintiff's name.

     The rules governing the practice of law in United States courts make clear that non-lawyers are not permitted to represent parties in federal court. See, e.g., U.S. v. Wilhelm, 570 F.2d 461, 465 (3d Cir. 1978); Lutz v. Lavelle, 809 F. Supp. 323, 325 (M.D. Pa. 1991). Parties to a federal action are entitled to "plead and conduct their own cases personally or by counsel," but not by way of a lay representative. 28 U.S.C. § 1654; see also Fed. R. Civ. P. 11(a) (requiring that all pleadings, motions, and submissions to federal courts be signed by an attorney

of record or by the unrepresented party himself/herself).  In this district in particular, the relevant

rules provide that a non-lawyer may not act as the legal representative or advocate for a party.

See L. Civ. R. 101.1 (governing admission to practice in the District of New Jersey); S.W. v.

Bridgeton Bd. of Educ., No. 05-0043, 2006 WL 469655, *3 (D.N.J. February 24, 2006) (noting

that a non-attorney cannot represent a party in New Jersey).  Any attempt by a non-lawyer to do

so constitutes the unauthorized practice of law.

　　　　In this case, Plaintiff filed a brief in opposition to the State Defendants' motion for

summary judgment on December 27, 2005.  On the cover page of that brief, in typeface, the

name "A. Khaliq" appears above the notation, "On the Brief."  Additionally, on the final page of

the brief, below Plaintiff's typewritten name, appears the handwritten signature: "A. Khaliq."

Plaintiff's signature does not appear anywhere on the final page, or elsewhere in his brief.  The

Court finds no listing for an "A. Khaliq" in the 2006 New Jersey Lawyer's Diary, or in other

reference guides listing those admitted to practice law in the District of New Jersey.  Thus, the

Court concludes that "A. Khaliq" has engaged in the unauthorized practice of law by preparing

and signing Plaintiff's opposition brief.  Accordingly, the Court has no choice but to strike

Plaintiff's December 27, 2005 opposition brief from the record in this case, and disregard the

arguments asserted therein.  However, because the various exhibits attached to and submitted

with Plaintiff's brief were clearly not authored by "A. Khaliq," such exhibits shall remain in the

record for consideration by the Court.[3]

---

　　　　[3] Plaintiff's January 26, 2006 brief in opposition to the motion to dismiss filed by Defendants
CMS and Gottwald is signed by Plaintiff alone.  Accordingly, the Court gave full consideration to the
arguments therein for the purposes of deciding that motion.  As mentioned above, Plaintiff did not file
written opposition to the motion for summary judgment filed by CMS and Gottwald.

**C.**      **Exhaustion Under the Prison Litigation Reform Act**

In their respective motions for summary judgment, both the State Defendants and

Defendants CMS and Gottwald argue that Plaintiff's constitutional claims are barred because he

failed to exhaust the administrative remedies available to him at SWSP before instituting this

action.  The Prison Litigation Reform Act of 1996 ("PLRA") requires that a prisoner asserting

claims under 42 U.S.C. § 1983 first exhaust all administrative remedies available to him. See 42

U.S.C. § 1997e(a).  Specifically, § 1997e(a) provides:

> No action shall be brought with respect to prison conditions under section 1983 of this
> title, or any other Federal law, by a prisoner confined in any jail, prison, or other
> correctional facility until such administrative remedies as are available are exhausted.

Exhaustion is mandatory, and prisoners must exhaust administrative remedies as to any claim

that arises in the prison setting, regardless of any limitations on the kind of relief available

through the grievance process. See Woodford v. Ngo, --- S. Ct. ----, 2006 WL 1698937, *2 (June

22, 2006);

 Porter v. Nussle, 534 U.S. 516, 532 (2002); Booth v. Churner, 532 U.S. 731, 741 n.6 (2001).

The PLRA applies to prison conditions, which include not only conditions affecting prisoners

generally, but also to "occurrences." Porter, 531 U.S. at 521.  The PLRA contains no futility

exception that would excuse a failure to exhaust, Booth, 532 U.S. at 741 n. 6, and a district court

lacks the authority to otherwise excuse compliance with the exhaustion requirement. See Nyhuis

v. Reno, 204 F.3d 65, 73 (3d Cir. 2000).  The PLRA requires not only technical exhaustion of

administrative remedies, but also substantial compliance with procedural requirements. Spruill v.

Gillis, 372 F.3d 218, 227-32 (3d Cir. 2004); see also Nyhuis, 204 F.3d at 77-78.  A procedural

default by the prisoner, either through late or improper filings, bars the prisoner from bringing a

claim in federal court unless equitable considerations warrant review of the claim. See Spruill, 372 F.3d at 227-32; see also Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000).

The administrative remedies available at SWSP are set forth in, and governed by, the SWSP Inmate Handbook ("SWSP Handbook"). See Villar Aff., Ex. A: Southwoods State Prison Handbook, pg. 96-97.  The SWSP Handbook describes the Inmate Grievance and Tracking Program ("Grievance Program") as a four-step, "direct and confidential route for inmates to make the Administration aware of their problems and concerns; allow the Administration to effect timely and appropriate responses to these problems and concerns; and provide a method for positive interaction between staff and inmates, therefore reducing the possibility of misunderstands through unanswered questions or unresolved complaints."[4] Id. at 96.  The first step of the SWSP Grievance Program is the "Inmate Request Form." Id.  After an inmate completes an "Inmate Request Form," his second step is to complete an "Interview Request Form," and his third step is to complete an "Administrative Remedy Form." Id. The fourth and final step is an appeal, facilitated by an "Administrative Remedy Form - Appeal."[5] Id.

The various remedy forms are available "from housing unit officers, Social Workers, and Law Libraries." Id.  Among other things, the Grievance Program forbids handwritten letters and

---

[4] It is beyond dispute that the Inmate Grievance Program described in the SWSP Handbook constitutes sufficient administrative remedies under the PLRA. See Concepcion v. Morton, 306 F.3d 1347, 1348-49 (3d Cir. 2002) (holding that the exhaustion requirement in the PLRA applies to the grievance procedure set forth in an inmate handbook not formally adopted by a state administrative agency).

[5] The SWSP Handbook explains that "Response Times" for administrative remedy requests are: thirty calender days for "'Routine' problems/concerns"; seven calender days for "Medical/Dental/Mental Health problems/concerns"; and five calender days for "'Urgent' problems/concerns - all departments." See Villar Aff., Ex. A: SWSP Handbook, pg. 96.  It is unclear at which among the first three steps the response period begins.

requires use of the mandated forms only. Id. at pg. 97.  The Grievance Program requires

completed forms "be placed in appropriate Drop Boxes that are located on each housing unit,"

and prohibits an inmate from forwarding "any forms in institutional mail or hand-delivery to

staff." Id.  "For the Detention Unit, the unit Social Worker or housing unit officer is to deposit

the forms in the appropriate Drop Box if requested to do so by an inmate." Id.

**D.      Plaintiff's Claims Against the State Defendants**

There is no question that Plaintiff did not exhaust the administrative remedies available to

him at SWSP with respect to his various Eighth Amendment claims.  In an affidavit submitted in

support of the State Defendants' motion for summary judgment, Carlos Villar, the Executive

Assistant II at SWSP, stated that he "conducted a search of records maintained by [SWSP]

concerning Administrative Remedy forms submitted by [P]laintiff," and confirmed that Plaintiff

"did not submit any Administrative Remedy [F]orms concerning the May 10, 2004 incident

which forms the basis of his claims in this matter." See Villar Aff. at ¶ 4.  Moreover, in his

November 30, 2004 letter to SWSP Administrator MacFarland, Plaintiff admitted that he "did

not file a grievance while incarcerated at SWSP." See MacFarland Letter, attached to Plaintiff's

Brief in Opposition to the State Defendants' Motion for Summary Judgment.

After Plaintiff's May 10, 2004 fight with his cell mate, Plaintiff was transferred to a

detention housing unit, where he remained until he was discharged and transferred to EJSP on

May 25, 2004. See Compl. at ¶ 35; Johnson Aff., Ex. A: Inmate Progress Note (final page); see

also Bishop Cert. Ex., B at Transfer Out Form.  The SWSP Grievance Program regulations

require an inmate in a detention unit to rely on the unit social worker or housing unit officer to

provide him with Administrative Remedy Forms, and later, to deposit completed Forms in the

14

"appropriate Drop Box" for the inmate. See Villar Aff., Ex A: SWSP Handbook, pg. 96.  In his November 30, 2004 letter to MacFarland, Plaintiff claimed he was unable to make use of the SWSP Grievance Program "because the Social Worker assigned to [the] Detention Unit failed to provide [Plaintiff] with the required Administrative Remedy Form." See Letter to MacFarland, attached to Plaintiff's Brief in Opposition to the State Defendants' Motion for Summary Judgment.

Plaintiff does not claim that the detention unit social worker refused his request for an Administrative Remedy Form.  Rather, he alleges only that the social worker *"failed to provide"* him with an Administrative Remedy Form.  It is unclear from his allegation if Plaintiff ever requested an Administrative Remedy Form, or simply expected the unit social worker to offer him one.  Further, Plaintiff's letter does not address whether he requested an Administrative Remedy Form from the housing unit officer assigned to the detention unit.  Moreover, if SWSP staff did refuse Plaintiff's request for an Administrative Remedy Form, it is difficult to imagine why Plaintiff would not have alleged such a fact among the thirty-two paragraphs in which he set forth the factual allegations in his Complaint.  Instead, Plaintiff relies on the single, vague allegation in his letter to MacFarland to imply that the SWSP detention unit staff affirmatively denied his persistent requests, over more than two weeks, for an Administrative Remedy Form. Mindful of my obligation to construe the facts in a light most favorable to Plaintiff on this summary judgment motion, I simply cannot accept such an inference in the absence of any evidence beyond Plaintiff's vague suggestion in a letter written six months after the events at issue, and in contemplation of litigation.

Plaintiff remained in the SWSP detention unit for more than two weeks before his

transfer to EJSP.  That period afforded more than sufficient time for him to complete and submit

appropriate  Administrative Remedy Forms for his various claims.  However, the record

establishes that he did not do so.  Instead, Plaintiff waited six months to attempt to exhaust his

administrative remedies, as evidenced by his November 30, 2004 letter to MacFarland.  Plaintiff

offers no explanation for the delay, which is especially perplexing in light of his allegation that

SWSP detention unit staff "failed" to provide him with Administrative Remedy Forms during the

period between May 10, 2004 and May 25, 2004.  In sum, the record does not establish a material

factual dispute on the question of  Plaintiff's failure to exhaust the administrative remedies

available to him at SWSP with respect to his Eighth Amendment claims.  Consequently, pursuant

to 42 U.S.C. § 1997e(a), those claims are barred, and I need not reach the State Defendants'

remaining arguments.

**E.     Plaintiff's Claims Against Gottwald and CMS**

**1. Gottwald**

Plaintiff's constitutional claim against Gottwald must be dismissed.  The record plainly

demonstrates that Plaintiff did not file any Administrative Remedy Forms while at SWSP.  A

fortiori, Plaintiff did not file such a form at SWSP in which he complained that he had been

deprived of medical treatment.  The voluminous medical evidence in the record makes clear that

Gottwald only treated Plaintiff twice; both times at SWSP.  Gottwald was never present at EJSP

and therefore could never have treated Plaintiff there.  Consequently, she could not have had any

involvement in the conduct that led Plaintiff to file the November 9, 2004 Administrative

Remedy Form at EJSP, in which he complained of inadequate medical treatment for his shoulder

injury.  Accordingly, Plaintiff's constitutional claim against Gottwald is barred by the PLRA

16

because of his failure to exhaust the administrative remedies available at SWSP.

Additionally, Plaintiff's state tort claim against Gottwald must also be dismissed. Gottwald cannot be liable to Plaintiff under a negligence theory.  To establish a <u>prima facie</u> case of negligence in a medical malpractice action, a plaintiff must present expert testimony demonstrating: (1) an applicable standard of care, (2) a deviation from this standard of care, (3) injury, and (4) proximate causation between the breach and the injury. <u>Jackson v. Fauver</u>, 334 F. Supp. 2d 697, 743 (D.N.J. 2004) (citing <u>Teilhaber v. Greene</u>, 320 N.J. Super. 453, 465, 727 A.2d 518 (App. Div. 1999)).  A medical malpractice case is "essentially no different from an ordinary negligence case." <u>Rosenberg v. Cahill</u>, 99 N.J. 318, 325 (1985); <u>see also</u> <u>Natale v. Camden County Corr. Facility</u>, 318 F.3d 575, 579 (3d Cir. 2003).

On this record, Plaintiff fails to state a <u>prima facia</u> malpractice claim against Gottwald. Accordingly, I need not reach the merits of the arguments she asserts in her motion to dismiss. As noted above, Gottwald only treated Plaintiff twice, and both occasions preceded his May 25, 2004 transfer to EJSP.  If there was a breach of a standard of care in this case, it had to do with the considerable delay between Plaintiff's injury on May 10, 2005, and his eventual surgery on November 17, 2004.  Gottwald was never present at EJSP while the events resulting in the delay of his surgery unfolded.  Moreover, in his Complaint, Plaintiff does not allege any specific facts that implicate Gottwald in the failure to ensure that Plaintiff timely received the surgical procedure prescribed by his physician.  In find that no reasonable jury could conclude that Gottwald deviated from any applicable standard she owed Plaintiff, and therefore, imposition of liability is impossible.  Accordingly, Plaintiff's medical negligence claim against Gottwald is dismissed.

17

## 2. CMS

While Plaintiff's failure to exhaust the administrative remedies available at SWSP bars his § 1983 claims against the State Defendants, the same is not the case for his constitutional claim against CMS.  On November 9, 2004, Plaintiff filed an Administrative Remedy Form at EJSP, in which he complained that he had not yet been provided with prescribed treatment for a shoulder injury he suffered at SWSP six months earlier.  In its moving papers, CMS does not address the Administrative Remedy Form Plaintiff filed at EJSP, and instead simply asserts that "it appears that [Plaintiff] never completed a required [A]dministrative [R]emedy [F]orm seeking any internal or administrative relief regarding complaints concerning medical treatment he received from [CMS]." Brief in Support of Motion for Summary Judgment filed by Defendants CMS and Gottwald, pg. 21.  That omission, which the Court assumes was a mere oversight and not the result of a lack of candor, is especially mystifying considering CMS included a copy of Plaintiff's November 9, 2004 EJSP Administrative Remedy Form among the exhibits it submitted in support of its motion for summary judgment. See Bishop Cert., Ex. B at Administrative Remedy Form.  In any event, the record establishes that Plaintiff exhausted the administrative remedies associated with his Eight Amendment claim against CMS.  Accordingly, I turn to the merits of that claim.[6]

---

[6] CMS also argues that an inmate's pre-litigation exhaustion of administrative remedies must be total; that is, a complaint raising *any* unexhausted claim must be dismissed in its entirety even if the complaint also alleges exhausted claims.  There is disagreement among the Circuit Courts of Appeals over the so-called "total exhaustion rule."  Compare Bey v. Johnson, 407 F.3d 801, 806 (6th Cir. 2005) (applying total exhaustion rule); Ross v. County of Bernalillo, 365 F.3d 1181, 1190 (10th Cir. 2004) (applying total exhaustion); Kozohorsky v. Harmon, 332 F.3d 1141 (8th Cir. 2003) (applying total exhaustion but allowing a plaintiff to amend his complaint and delete unexhausted claims); with Ortiz v. McBride, 380 F.3d 649, 656-67 (2d Cir. 2004) (rejecting total exhaustion).  The Third Circuit has not addressed the question directly.  However, in Vazquez v. Ragonese, 142 Fed. Appx. 606 (3d Cir. 2005), an unpublished, non-precedential opinion, the Third Circuit affirmed a district court's dismissal without prejudice of a complaint in which a plaintiff had asserted both exhausted and unexhausted claims, and

**(a)  Failure to Provide Medical Treatment**

Section 1983 provides for the imposition of liability on any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983.  The statute is not a source of substantive rights, but merely provides "a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989).  To assert a claim successfully under § 1983, a plaintiff must allege a violation of a right secured by the Constitution and laws of the United States and that the alleged deprivation was committed by a person "acting under color of State law." West v. Atkins, 487 U.S. 42, 48 (1988); Natale, 318 F.3d at 580-581.

The Eighth Amendment provides a constitutional basis for a § 1983 claim by prisoners alleging inadequate medical care.  However, "[f]ailure to provide medical care to a person in

gave the plaintiff the opportunity to submit his unexhausted claims to the prison administration or abandon those claims and proceed only on the exhausted claims.

Among the district court decisions in the Third Circuit that address the applicability of the total exhaustion rule is Rivera v. Whitman, 161 F. Supp. 2d 337, 343 (D.N.J. 2001), abrogated on other grounds as recognized in Ray v. Kertes, 285 F.3d 287, 293 n.6 (3d Cir. 2002).  In Rivera, Judge Irenas undertook a lengthy analysis of the PLRA, and concluded "the plain language of section 1997e(a), as well as the legislative intent and policy interests behind it, compels a 'total exhaustion' rule."  However, more recently, courts in this Circuit have declined to apply the total exhaustion rule when deciding motions by defendants in § 1983 actions that include both exhausted and unexhausted claims. See Moore v. Correctional Medical Services, No. 05-3525, 2006 WL 1478863, *4 (D.N.J. May 26, 2006) (Cavanaugh, J.) (declining to apply the total exhaustion rule); Abuhoran v. Morrison, No. 03-3091, 2005 WL 2140537, *6 n.28 (E.D. Pa. September 1, 2005) (Yohn, J.) ("because defendants have not raised a 'total  exhaustion' argument, and because the issue remains unsettled in this circuit, I will assume for the purposes of this case only that the PLRA does not include a 'total  exhaustion' component, and I will address the merits of plaintiffs' exhausted claims."); Boyd v. Pugh, No. 04-1761, 2005 WL 1430087, *3 n.1 (M.D. Pa. June 17, 2005) ("In allowing the claim concerning the denial of adequate medical care to proceed, the Court declines to adopt the 'total  exhaustion' rule argued by Defendants in light of the disagreement among the Circuits concerning the issue.").

In the absence of definitive guidance from the Third Circuit, and considering the conflict among the district courts in this Circuit, I decline to apply the total exhaustion rule to the unique facts of this case.

19

custody can rise to the level of a constitutional violation [of the Eighth Amendment] under §

1983 only if that failure rises to the level of deliberate indifference to that person's serious

medical needs." <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 636-37 (3d Cir. 1995).  The

"deliberate indifference" standard is, essentially, a two-pronged test, requiring: (1) that the

prisoner's medical needs be serious, and (2) that there be deliberate indifference on the part of

defendants. <u>See</u> <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d 754, 762 (3d Cir. 1979);

<u>Monmouth County Correctional Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 346 (3d Cir.1987), <u>cert.</u>

<u>denied</u>,486 U.S. 1006 (1988).  Mere disagreement with the form of treatment does not rise to a

constitutional violation. <u>Estelle v. Gamble</u>, 429 U.S. 97, 107 (1976).  Moreover, medical

malpractice, even if it did occur, does not become a constitutional claim merely because the

victim is a prisoner. <u>Id.</u> at 106.

CMS does not dispute that it was acting under color of state law when it provided

medical care to Plaintiff.  However, CMS cannot be held liable for the acts of its employees and

agents under the theories of <u>respondeat superior</u> or vicarious liability.[7] <u>Natale</u>, 318 F.3d at 583;

<u>Monell v. Dep't Of Soc. Serv. of City of New York</u>, 436 U.S. 658, 691 (1978).  To establish that

CMS is directly liable for the alleged Eighth Amendment violations perpetrated by its agents,

Plaintiffs "must provide evidence that there was a relevant [CMS] policy or custom, and that the

policy caused the constitutional violation[s] they allege." <u>Natale</u>, 318 F.3d at 584.

According to the Third Circuit, "[n]ot all state action rises to the level of custom or

policy." <u>Id.</u>  "A policy is made when a decisionmaker possessing final authority to establish

---

[7] "<u>Respondeat superior</u> and vicarious liability are the theories under which courts 'impose liability vicariously ... solely on the basis of the evidence of an employer-employee relationship with a tortfeasor.'" <u>Natale</u>, 318 F.3d at 584 (quoting <u>Monell</u>, 436 U.S. at 692).

municipal policy with respect to the action issues a final proclamation, policy or edict." Id.

(internal citations omitted).  "Custom" is defined as "an act 'that has not been formally approved

by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law'." Id.

(quoting Bd. of Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997)).  The

Third Circuit has identified three situations in which it will consider acts of government

employees, or employees of a private entity acting under color of state law, to result from a

government policy or custom. Natale, 318 F.3d at 584.  In these situations, the government will

be held directly liable under § 1983.  The three situations leading to direct government liability

are:

> [1] appropriate officer or entity promulgates a generally applicable statement of policy
> and the subsequent act complained of is simply an implementation of that policy ... [2] no
> rule has been announced as policy but federal law has been violated by an act of the
> policymaker itself ... [3] policymaker has failed to act affirmatively at all, though the need
> to take some action to control the agents of the government is so obvious, and the
> inadequacy of existing practice so likely to result in the violation of constitutional rights,
> that the policymaker can reasonably be said to have been deliberately indifferent to the
> need.

Id. (internal citation omitted).

Here, Plaintiff presents no documentary evidence to support the existence of a CMS

policy or custom that caused the constitutional violation he alleges.  Not only does Plaintiff fail

to establish the existence of such a policy or custom, generally, but he also fails to establish such

in this case.  Indeed, the medical evidence in the record establishes that CMS was responsive to

Plaintiff's medical needs immediately following his injury.  On May 10, 2004, the day of

Plaintiff's injury, SWSP Nurse Pipitone, examined his shoulder and consulted with Dr. Hoey

who prescribed pain medication, use of a sling, and application of an ice pack.  Piptone also

arranged for Plaintiff to be seen at an orthopedic clinic in Cumberland County. The next day, Pipitone performed a follow-up evaluation of Plaintiff's shoulder provided with him with a fresh ice pack. Gottwald and Nurse Mish also examined Plaintiff on May 11, 2004, after his visit to the orthopedic clinic. On May 12, 2004, Plaintiff completed an MRI screening checklist. On May 25, 2004, Plaintiff was transferred from SWSP to EJSP. On June 10, 2004, Plaintiff underwent an MRI which revealed the extent of his injury. Two weeks later, on June 24, 2004, Dr. Donokor examined Plaintiff's shoulder and recommended surgery. Id. On July 2, 2004, Plaintiff signed a consent form to undergo surgery on his left shoulder.

It is not until after Plaintiff's shoulder surgery was allegedly scheduled, and a consent form executed, that the steady pace of Plaintiff's medical treatment slowed to a halt. The record appears to indicate that a scheduling error or oversight resulted in the extended delay from July 2, 2004, when Plaintiff gave informed consent to undergo surgery, to November 17, 2004, when that surgery ultimately took place. That error is evidenced in the record by Nurse Goroza's September 13, 2004 note in Plaintiff's medical chart indicating that Plaintiff's surgery was simply never scheduled. Whatever the source of that oversight, there is no evidence that the failure was caused by a policy or custom adhered to officially or unofficially by CMS or any of its employees. In the absence of evidence to the contrary, there is no material factual dispute that CMS cannot be directly liable for the alleged Eighth Amendment violation perpetrated by its agents, and Plaintiff's constitutional claim against it cannot succeed. Accordingly, CMS's motion for summary judgment on Plaintiff's § 1983 claim is granted.

**(b) State Law Medical Negligence Claim**

CMS also move to dismiss what they interpret as Plaintiff's medical negligence claim.

22

Notwithstanding the liberal notice pleading standard of <u>Fed. R. Civ. P.</u> 8(a), the Court is not fully persuaded that Plaintiff's allegations regarding his medical treatment can be fairly construed as stating such a negligence claim.  Plaintiff devotes two Counts of his Complaint to his medical claims.  They state in full:

> Defendants CMS demonstrated deliberate indifference to the plaintiff's serious medical needs on May 10, 2004, when the plaintiff sustained a dislocated shoulder, and delayed such treatment for several days, and even months, resulting in surgery with two metal pins installed in his left shoulder, deprived plaintiff of his rights under the Eighth Amendment to be free from cruel and unusual punishment and the due process clause of the Fourteenth Amendment to the United States Constitution.

Compl. at ¶ 64 ("Count Seven");

> Because of the actions and inactions of CMS defendants demonstrated their deliberate indifference to the serious medical needs of plaintiff causing plaintiff to suffer great physical pain as a result of their egregious delays in prescribing treatment to plaintiff's shoulder injury, thus, violated plaintiff's rights under the Eighth Amendment to be free from cruel and unusual punishment and the due process clause of the Fourteenth Amendment to the United States Constitution

Compl. at ¶ 66 ("Count Eight").[8]

Both Counts appear, by their plain language, to state the same Eighth Amendment claim alleging CMS's failure to promptly treat Plaintiff's shoulder injury subjected him to cruel and unusual punishment.  Absent from both Counts, however,  are terms ordinarily associated with negligence claims such as: "negligence," "duty," "breach," "causation," or "malpractice."  While I am obliged to construe the pleadings of <u>pro</u> <u>se</u> litigants liberally, <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972); <u>Alston v. Parker</u>, 363 F.3d 229, 234 (3d Cir. 2004), I need not expand the breadth of otherwise clear language to encompass a cause of actions not within its scope.  In this

---

[8] The Court reproduces the relevant text of Count Seven and Eight of Plaintiff's Complaint without correction or citation of internal errors.

case, Plaintiff appears to merely repeat his constitutional claim in both Count Seven and Count Eight.  He does not expressly assert a medical negligence claim in either.  Nevertheless, CMS interprets at least one of the above Counts as asserting a medical malpractice claim.  On that basis, and because a faint allegation of a malpractice claim can be discerned from the text of Count Eight, I address the issue.

As discussed above, to establish a prima facie case of negligence in a medical malpractice action, a plaintiff must present expert testimony demonstrating: (1) an applicable standard of care, (2) a deviation from this standard of care, (3) injury, and (4) proximate causation between the breach and the injury. Jackson, 334 F. Supp. 2d at 743.  CMS argues that Plaintiff's threshold failure to establish the applicable standard of care through the filing of an affidavit of merit, as required under New Jersey law, requires dismissal of his negligence claim.

The New Jersey legislature enacted the Affidavit of Merit Statute, N.J. Stat. Ann. § 2A:53A-27 to -29, as part of a tort reform package "designed to strike a fair balance between preserving a person's right to sue and controlling nuisance suits." Palanque v. Lambert-Woolley, 168 N.J. 398, 404 (2001) (internal quotation marks omitted).  The statute requires the plaintiff in a malpractice action to file "an affidavit of an appropriate licensed person [stating] that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices." N.J. Stat. Ann. § 2A:53A-27.  The penalty for not following the statute is severe: absent a showing of extraordinary circumstances, the failure to file the affidavit within sixty days of the filing of the answer "shall be deemed a failure to state a cause of action." § 2A:53A-29; Cornblatt v. Barow, 153 N.J. 218, 247 (1998)

24

("[a]bsent extraordinary circumstances, a failure to comply with the statute ... requires ... dismissal ... with prejudice.")  This requirement "curtail[s] frivolous litigation without preventing access to the courts for meritorious claims." Palanque, 168 N.J. at 404.

Plaintiff argues that he has substantially complied with the Affidavit of Merit Statue, and that equity requires that his claim be allowed to proceed.  Alternatively, Plaintiff asserts that the relevant standard of medical care in this case is a matter of common knowledge.  Accordingly, he argues that he need not have submitted an affidavit of merit in the first instance.

The New Jersey Supreme Court has recently reaffirmed its recognition of the equitable doctrine of substantial compliance. Galik v. Clara Maass Medical Center, 167 N.J. 341, 352 (2001).  The purpose of the doctrine "is to avoid the harsh consequences that flow from technically inadequate actions that nonetheless meet a statute's underlying purpose." Id.  It is a doctrine based on justice and fairness, designed to avoid technical rejection of legitimate claims. Id. (citing Zamel v. Port of N.Y. Auth., 56 N.J. 1, 5-6  (1970)).  The doctrine of substantial compliance requires a defaulting party to demonstrate: (1) lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute. Fink v. Thompson, 167 N.J. 551, 561 (2001).

CMS argues that Plaintiff cannot demonstrate substantial compliance with the Affidavit of Merit Statute.  It is undisputed that Plaintiff has made no effort to retain an expert, and, consequently, has not attempted to submit a late affidavit.  Nevertheless, Plaintiff argues that he should be deemed in substantial compliance with the Affidavit of Merit Statute because CMS

25

will not be prejudiced if this action -- about which they have been aware since June 13, 2005 -- is allowed to proceed.  Plaintiff also asserts that his poor comprehension of, and fluency in, English, coupled with his status as an indigent, incarcerated, pro se litigant reasonably explains his lack of strict compliance with the Affidavit of Merit Statute.  The Court, however, is unconvinced that Plaintiff's conduct or status satisfies the substantial compliance doctrine.

Since July 25, 2005, when CMS filed an Answer to his Complaint, Plaintiff has done essentially nothing to comply with the Affidavit of Merit Statute.  Indeed, he remains in the identical position he occupied at the expiration of the sixty-day statutory filing deadline.  Such inaction cannot be deemed tantamount to substantial compliance, nor is Plaintiff's ignorance of the law, or Plaintiff's status as a pro se litigant, sufficient to excuse his failure to comply with the Affidavit of Merit Statute.  See, e.g., Lee v. Thompson, 163 Fed. Appx. 142, 144 (3d Cir. 2006); Taylor v. Plousis, 101 F. Supp. 2d 255, 270 (D.N.J. 2000); see also Hyman Zamft and Manard v. Cornell, 309 N.J. Super. 586,  (1999) ("ignorance of the law or failure to seek legal advice will not excuse failure to meet the filing deadline.").  However, as discussed below, because I find that the common knowledge doctrine obviates the need for an affidavit of merit in this case, Plaintiff's failure to comply with the Affidavit of Merit Statute is not fatal to his claim against CMS.

Where common knowledge renders a claim's merit readily apparent from a reading of a plaintiff's complaint, an expert's affidavit is unnecessary.  Hubbard v. Reed, 168 N.J. 387, 394-95 (2001); see also Natale, 318 F.3d at 579-80; Jackson, 334 F. Supp. 2d at 743.  In such cases, "the jurors' common knowledge as lay persons is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the

specialized knowledge of experts," Estate of Chin v. Saint Barnabas Med. Ctr., 160 N.J. 454, 469

(1999), and "the jury itself is allowed to supply the applicable standard of care and thus to

obviate the necessity for expert testimony relative thereto." Rosenberg, 99 N.J. 3 at 325

(quotations and citation omitted). "In other words, because the issue is not 'peculiarly within the

knowledge of a medical ... practitioner,' the case is treated as an ordinary negligence action in

which a jury can determine without the aid of experts whether a defendant acted with reasonable

care." Palanque, 168 N.J. at 406 (quoting Estate of Chin, 160 N.J. at 469).

 In this case, a reasonable jury could conclude that CMS was negligent absent expert

testimony.  CMS personnel failed to schedule Plaintiff's appointment for shoulder surgery well

after the severity of his injury was established.  The record makes clear that at least one

physician, Dr. Packman, opined on May 11, 2004, that Plaintiff's left shoulder rotator cuff, if

torn, would require surgical repair within three weeks of confirmation of such injury.  However,

nearly six weeks passed until Plaintiff underwent an MRI, on June 24, 2004, and another week

passed before Plaintiff was asked, on July 2, 2004, to give informed consent to undergo surgery.

Inexplicably, more than eight additional weeks passed until September 13, 2004, when CMS

employees discovered that Plaintiff's surgery had not even been scheduled.  And that did not end

the unexplained delays.  On October 12, 2004, after another four weeks passed, Plaintiff's

surgery was finally scheduled for November 17, 2004, more than four weeks later.

 Thus, the issue here is CMS's failure to effect Plaintiff's shoulder operation promptly

after identifying the seriousness of his injury and his need for surgery.  Plaintiff executed an

informed consent waiver on July 2, 2004, but his surgery was not scheduled until October 12,

2004.  In the interim, Plaintiff's medical chart indicates that nothing happened with respect to his

shoulder injury to account for the delay.  There is no indication that an alternative treatment course was attempted; nor any notation of a lack of availability of services.  Instead, the only notation relevant to Plaintiff's shoulder injury is Nurse Goroza's September 13, 2004 discovery that Plaintiff's surgery had simply not been scheduled.  No special expertise or expert testimony is needed to show, at the outset, that Plaintiff's claim is not frivolous.[9]  Therefore, no affidavit of merit is required in this case, and Plaintiff's medical malpractice claim may proceed against CMS.

Accordingly, CMS's motion to dismiss Plaintiff's medical negligence claim is denied. Furthermore, because there exists a material question of fact as to whether CMS departed from the applicable standard of care in treating Plaintiff's shoulder injury, and, if so, whether that deviation caused Plaintiff to suffer additional injury, summary judgment is also denied.

## F.     Appointment of Counsel

In Plaintiff's brief in opposition to the motion to dismiss filed by CMS and Gottwald, Plaintiff petitions the Court for appointment of counsel.  Pursuant to 28 U.S.C. §1915(e), a court may request an attorney to represent an indigent plaintiff in a civil action.[10]   However, the

---

[9] Of course, while the common knowledge doctrine relieves Plaintiff of his obligation to comply with the Affidavit of Merit Statute, it does not relieve him of the burden of proving his case at trial. Indeed, at trial, Plaintiff must present evidence that a delay by CMS in effecting his surgery caused him additional injury for which he is entitled to money damages.  In that connection, Plaintiff will require the testimony and/or reports of expert medical witnesses to prove his allegations that the delay in his treatment necessitated more intensive or different surgery, or exacerbated his injury beyond its initial severity.  The common knowledge doctrine only allows the jury to establish the relevant standard of care in this case, it does not relieve Plaintiff of his burden to prove that CMS departed from that standard, and that such a departure caused Plaintiff's alleged injuries.

[10] Section 1915 provides in relevant part:

> (1) The court may request an attorney to represent any person unable to afford counsel. (2) Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any

28

appointment of counsel under §1915(e) is a privilege, not a statutory or constitutional right,

Purnell v. Lopez, 903 F. Supp. 863, 864 (E.D. Pa. 1995), and within a court's sole discretion.

Parham v. Johnson, 126 F.3d 454, 457 (3d Cir. 1997); see also, Tabron v. Grace, 6 F.3d 147, 155

(3d Cir. 1993), cert. denied, 510 U.S. 1196 (1994).  Appointment of counsel may be made at any

point during the litigation or by a court sua sponte. Tabron, 6 F.3d at 156.  In exercising its

discretion under §1915(e), a court is required, as a preliminary matter, to determine whether the

claim has "some merit in fact and law." Parham, 126 F.3d at 457.

If a court finds that an action is not frivolous and has merit, it must consider the following

several factors to determine whether appointment of counsel is appropriate:

(1)     plaintiff's ability to present his or her own case;
(2)     the complexity of the legal issues;
(3)     the degree to which factual investigation will be necessary
        and the ability of the plaintiff to pursue such investigation;
(4)     the amount a case is likely to turn on credibility
        determinations;
(5)     whether the case will require the testimony of expert
        witnesses, and;
(6)     whether the plaintiff can attain and afford counsel on his or
        her own behalf.

Tabron, 6 F.3d at 156-157.  This list is not exhaustive, nor is any single factor determinative. Id.

at 157.  The factors ensure that courts will only appoint counsel in non-frivolous matters.

Parham, 126 F.3d at 461.

The first factor for consideration is a plaintiff's ability to present his own case.  A court

should consider a plaintiff's literacy, education, and prior work and litigation experience. Tabron,

_____

time if the court determines that-(A) the allegation of poverty is untrue;
or (B) the action or appeal-(i) is frivolous or malicious; (ii) fails to state
a claim on which relief may be granted; or (iii) seeks monetary relief
against a defendant who is immune from such relief.

29

6 F.3d at 156.  A plaintiff's ability to understand English is also relevant. Id.  If a plaintiff is incarcerated, the restraints placed upon him by his confinement should also be considered. Id. With regard to the second factor, a court should be more inclined to appoint counsel when the legal issues are complex. Id.  Where the law is unclear, it will best serve the ends of justice to have both sides of a legal issue presented by those trained in legal analysis. Id.  With respect to the third factor, the degree to which factual investigation will be necessary and a plaintiff's ability to pursue such an investigation, a court may consider the extent to which prisoners suffering confinement face problems in pursuing their claims. Tabron, 6 F.3d at 156. Consideration of the fourth factor, whether a case is likely to turn on credibility determinations, should focus on whether the case is largely based on the word of one side against the world of the other side. Parham, 126 F.3d at 460.  Regarding the fifth factor, appointment of counsel may be warranted where the case will require testimony from expert witnesses. Tabron, 6 F.3d at 156. Finally, the proper consideration the sixth and last factor, a plaintiff's ability to pay for counsel on his own behalf, is largely self evident in the case of an indigent, incarcerated plaintiff. Parham, 126 F.3d at 461.

In this case, I find that Plaintiff's medical negligence claim against CMS has threshold merit, and that appointment of counsel is appropriate based on the factors identified above. Plaintiff's ability to present his own case is circumscribed by, among other things, his limited understanding of, and utility with, the English language as well as his status as an incarcerated indigent.  The negligence claim he asserts against CMS involves complex matters of appropriate medical care, and litigation of that claim will require detailed and well-planned expert and lay

testimony.[11]  Plaintiff's limited communication skills will make it difficult for him to conduct

any meaningful discovery or otherwise investigate his claims in preparation for trial.  Similarly,

those limitations will make it difficult for Plaintiff to testify in a manner that accurately reflects is

credibility or lack thereof.  Finally, Plaintiff lacks the financial resources to attain and afford

private counsel on his own behalf.  Accordingly, I conclude that appointment of counsel is

appropriate, and Plaintiff's request for such appointment is granted.

## III.   CONCLUSION

Plaintiff failed to exhaust the administrative remedies available to him at SWSP with

respect to the § 1983 claims asserted in his Complaint against the State Defendants.

Consequently, those claims are barred by 42 U.S.C. § 1997e(a), and the State Defendants'

motion for summary judgment is granted.  In addition, Plaintiff's § 1983 claim against Gottwald,

alleging that she denied him medical treatment, is also barred by the PLRA because of Plaintiff's

failure to exhaust his administrative remedies with respect to that claim while he was housed at

SWSP.  Plaintiff's identical constitutional claim against CMS is not barred by the PLRA because

Plaintiff exhausted his administrative remedies at EJSP, where CMS oversees the provision of

medical services to inmates.  However, Plaintiff's failure to present a question of material fact as

to the existence of a policy or custom observed by CMS that resulted in the delay that caused his

injury is fatal to his § 1983 claim against CMS.  Accordingly, CMS's motion for summary

judgment on that claim is granted.

Furthermore, Plaintiff's medical negligence claim against Gottwald is dismissed because

---

[11] The Court notes the potential difficulty Plaintiff may encounter in retaining an expert witness due to his indigent status.  Pro bono counsel is alerted to the pro bono fund, and directed to consider making application to such fund to support payment to retain any necessary expert witness in this case.

there is no evidence to support imposition of liability for Plaintiff's injuries.  Gottwald never treated Plaintiff at EJSP, and there is no evidence that she was responsible for any of the acts or omissions at EJSP that resulted in the alleged aggravation of Plaintiff's shoulder  injury. However, because a reasonable jury could conclude that CMS, through its employees, deviated from the acceptable standard of care in treating Plaintiff's shoulder injury, its motion to dismiss, or for summary judgment on Plaintiff's medical negligence claim is denied.  Finally, because I conclude that Plaintiff's meritorious medical negligence claim presents issue of sufficient complexity and difficulty, especially in light of Plaintiff's poor comprehension of and fluency in English, I grant his request for appointment of pro bono counsel.

        An appropriate Order shall follow.


        /s/ Freda L. Wolfson
        United States District Judge

Date: June 26, 2006